**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
**FRANK COLLINS,**

                     **Petitioner,**

     **-against-**

**JOHN BEAVER, Superintendent, Orleans**
**Correctional Facility,**

                    **Respondent.**
-----------------------------------------------------------x

                                           **OPINION & ORDER**

                                      **03 CV 0416 (NG)**

**GERSHON, J.:**

      Frank Collins brings this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254,

challenging his February 10, 2000 conviction after a jury trial of Criminal Possession of a Weapon

in the Second Degree (N.Y. Penal Law § 265.03(2)) and Criminal Possession of a Weapon in the

Third Degree (N.Y. Penal Law § 265.02(4)).  Petitioner was sentenced to concurrent terms of four

years on each count.  On direct appeal petitioner claimed that: (1) the trial court had incorrectly

denied his challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986); and (2) his sentence was

excessive.  The Appellate Division, Second Department, in affirming petitioner's conviction,

expressly denied both of petitioner's claims and affirmed the conviction, *People v. Collins*, 290

A.D.2d 513 (2d Dep't 2002).  Leave to appeal to the New York Court of Appeals was denied.

*People v. Collins*, 98 N.Y.2d 650 (2002).

      In his petition, filed *pro se*, petitioner alleges that:(1) the trial court erred in not granting

certain *Batson* challenges made by trial counsel; (2) his sentence was harsh and excessive; (3)  the

trial court improperly denied suppression of the gun and petitioner's statements; and (4) the

Appellate Division improperly refused to allow petitioner to submit a *pro se* brief.  On October 24,

2003, the State filed a Memorandum in Opposition to the petition. On November 21, 2003, petitioner filed a "Traverse and Memorandum of Law," in which he raises additional factual reasons why the trial court erred in denying his suppression motion and what appears to be a claim of ineffective assistance of appellate counsel. On January 20, 2004, I issued an Order appointing James Cohen, Esq., Fordham University Professor of Law, as counsel for petitioner, pursuant to 18 U.S.C. § 3006A(a)(2)(b). On August 2, 2004, petitioner's counsel filed a Supplemental Memorandum in support of the petition for habeas corpus, which offers additional arguments in support of petitioner's *Batson* claim. An August 19, 2004 letter from Assistant Attorney General Luke Martland indicated that the State would rely on its prior submission and did not seek to file any responsive papers to the Supplemental Memorandum. This Opinion and Order will address all claims brought in the petition.

## BACKGROUND

Petitioner, a resident in a senior citizen home in Queens, was charged with shooting another resident, Willie Hankerson, in the hand following an argument, and with gun possession. Hankerson reported the incident to the police, who dispatched Paul Valdes, William Trigg and other unidentified officers to the scene. Mr. Hankerson provided Officer Valdes with petitioner's first name and described him as a tall, African-American man, in his seventies, wearing a long black leather coat. Mr. Hankerson also stated that he and petitioner lived in the building, that the incident had occurred on the second floor, and that petitioner was probably still in the building. Officer Valdes provided this information to Officer Trigg, who, along with the other officers, proceeded to search the building. Approximately a half hour later, while in the basement of the building, Officer Trigg encountered the petitioner, an African-American man wearing a three-quarters length jacket.

Officer Trigg directed petitioner to put his hands up, and asked him where his gun was; petitioner indicated the weapon was in his pocket. Officer Trigg disarmed and handcuffed petitioner and asked petitioner to identify himself. In response, petitioner replied that his name was "Frank Collins," confirming Hankerson's statement. Petitioner was then brought outside, and Hankerson identified petitioner, stating "that's Frank." Following petitioner's arrest, Officer Valdes recovered bullets from petitioner's pockets.

Petitioner moved to suppress his identifying statements to Officer Trigg, his gun, ammunition, and his subsequent identification by Hankerson. On October 13, 1999, Justice Randall T. Eng, Supreme Court, Queens County, denied petitioner's motion to suppress, finding that:

> Based upon the earlier radio transmission of "shots fired" at 53-11 99th Street, the close temporal and physical proximity of the defendant to the site of the crime, and Officer Trigg's observation of the defendant, who matched the description given to him by a fellow officer, there was reasonable suspicion to "stop" the defendant and order him to put his hands up . . . .
>
> The questioning of the defendant concerning the whereabouts of the gun was permissible. Although the questioning occurred while the defendant was in custody and without the benefit of *Miranda* warnings, it has long been the law that "an officer may ask questions to clarify a potentially dangerous situation before giving Miranda warnings," including the asking of an apprehended suspect about a weapon.

Order Denying Motion to Suppress at 3-4. Justice Eng also found that the seizure of petitioner's weapon was justified :

> [P]robable cause for defendant's arrest existed and the subsequent seizure of ammunition from the person of the defendant at the precinct was justified as incidental to a lawful arrest . . . . the credible evidence adduced at the *Rodriguez* hearing established the 'familiarity' of the victim with the defendant, thereby negating a claim of suggestiveness with the respect to the showup outside the ambulance.

*Id*. at 4.

During jury selection, petitioner made several objections to the prosecutor's allegedly discriminatory use of peremptory challenges against black persons. The prosecutor exercised four peremptory challenges against blacks; petitioner made *Batson* applications after the last three. In the first round of jury selection, trial counsel observed, without making a *Batson* application, that the prosecutor had peremptorily struck "the only black member of the entire panel."[1]  Tr. 254.  The prosecutor responded that she had been inclined to retain the juror until the juror indicated that serving jury duty could require her to work weekends.  Tr. 254.

In the second round of jury selection, following the prosecution's removal of potential juror Carolyn Brown, trial counsel made a *Batson* application stating that "all the black jurors, and there were very few on either of these panels . . . were [struck] by the People." Tr. 321.  Defense counsel asserted that three black potential jurors had been struck by the prosecutor over the course of jury selection, one in the first round and two in the second round, and that this established a pattern of discrimination.[2]  Tr. 321.  In response, the prosecution stated that the prospective juror struck in the first round had been found unfit to serve as a matter of law and offered a race-neutral justification for the challenge to the black potential juror struck in round number two, Carolyn Brown.  Tr. 321.  The court found the prosecutor's explanation to be "reasonable" and further indicated that he did not believe petitioner had established a *prima facie* case.  Tr. 322-323.

After the third round of jury selection, the prosecution moved to peremptorily challenge two

[1]In this Opinion, numerical references to the rounds of jury selection refer to the rounds beginning on November 1, 1999, after a mistrial was declared for reasons unrelated to the issues raised in this petition.

[2]One of the black potential jurors struck in the second round was apparently for cause.  Defense counsel stated, after identifying three potential jurors stricken in rounds one and two, that two were peremptorily challenged and that one was stricken for cause over defense counsel's objection.  Tr. 321.

of the remaining six jurors, one of whom, potential juror Tony Barnes, was black; defense counsel made a *Batson* application, stating that "once again the people have struck a black juror." Tr. 410. The court stated that no *prima facie* case had been made and that the prosecution was not obligated to provide a reason for his challenge. Tr. 411. Nevertheless, the prosecution offered a race-neutral justification, which defense counsel argued was pretextual. Tr. 412. The court rejected petitioner's *Batson* application.[3] Tr. 412.

Following the sixth round of juror selection, the prosecution peremptorily challenged potential juror Celeste Sabb, a black woman, and petitioner again made a *Batson* application. Tr. 616. Defense counsel argued that the People had peremptorily challenged another black woman, that there had been very few prospective black jurors on the panels, and that a persistent pattern of striking black jurors had been established. Tr. 616. The trial court denied defense counsel's application, again finding that petitioner had failed to establish a *prima facie* case of discrimination. Tr. 617. The prosecution did not offer a race-neutral justification for challenging Ms. Sabb, stating that a pattern of strikes against blacks had not been established. Tr. 617. The prosecutor also stated that there was one black woman seated on the jury and that two other blacks were on the panel. Tr. 618.

After trial, petitioner was convicted on weapons possession charges. Following his conviction, petitioner, through counsel, filed an appeal on the grounds that: (1) the trial court had incorrectly denied petitioner's *Batson* challenges; and (2) petitioner's sentence was excessive. Petitioner also requested permission to file a *pro se* supplemental brief, which was denied. On January 22, 2002, the Appellate Division unanimously affirmed petitioner's conviction. *People v.*

---

[3] The prosecution's justification and the trial court's ruling are discussed more fully later in this Opinion.

*Collins*, 290 A.D.2d 513 (2d Dep't 2002). The Appellate Division held that the trial court had properly denied petitioner's *Batson* motion because he had failed to establish any "facts and other relevant circumstances supporting an inference of impermissible discrimination." *Id.* at 514. The Appellate Division also held that "petitioner's assertion the prosecutor struck a disproportionate number of black venirepersons was insufficient to establish a pattern of purposeful exclusion sufficient to raise an inference of discrimination." *Id.* The court went on to find that petitioner's sentence was not excessive and his "remaining contentions are without merit." *Id.* On May 13, 2002, the Court of Appeals denied petitioner's leave application. *People v. Collins*, 98 N.Y.2d at 650.

On April 6, 2002, petitioner moved *pro se* to vacate his conviction pursuant to New York Criminal Procedure Law §440.10 alleging that the hearing court had improperly denied his suppression motion. On May 14, 2002, the Honorable Ronald Hollie of the New York State Supreme Court denied petitioner's motion as procedurally barred. Petitioner did not seek leave to appeal the denial of his Section 440 motion.

On June 14, 2002, petitioner filed a motion for writ of error *coram nobis* with the Appellate Division, contending that his appellate counsel had been ineffective for failure to argue that his suppression motion should have been granted. The Second Department denied petitioner's motion on September 30, 2002, finding that petitioner had not established that he was denied effective assistance of appellate counsel. Petitioner sought leave to appeal this decision which was denied by the Court of Appeals on December 27, 2002. *People v. Collins*, 99 N.Y.2d 556, 754 (2002). Petitioner then filed this petition for habeas corpus relief.

## DISCUSSION

### I. Exhaustion

Respondent argues that petitioner's *Batson* claim and his excessive sentence claim are not exhausted, since petitioner's attorney's letter seeking leave to the New York Court of Appeals failed to present these claims, merely stating that copies of the Appellate Division decision and briefs were enclosed.[4] Under 28 U.S.C. § 2254(b), federal courts may not consider the merits of a habeas corpus petition if the petitioner has not presented his federal constitutional claims to the highest court of the state. *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir.2000), *cert. denied*, 531 U.S. 819 (2000). The petitioner "must give the state's highest court a fair opportunity to pass on his federal claim." *See id.*

While petitioner's request for leave did not specify which issues were submitted, where a petitioner submits only a brief letter referencing the attached briefs, the court "can only conclude that the Court of Appeals would construe the concise application. . . as a request for review of *all* of the issues outlined in the briefs." *Galdamez v. Keane*, 394 F.3d 68, 75-76 (2d Cir. 2005) (holding that claims were fully exhausted where petitioner's letter requesting leave to appeal consisted of statement: "[e]nclosed please find briefs submitted to the Appellate Division together with the decision affirming the conviction.") (emphasis in original). This situation is distinct from that in which a petitioner's letter to the Court of Appeals highlights certain issues and ignores others. In that scenario, the unmentioned claims are unexhausted, regardless of whether the petitioner's briefs are attached. *See Smith v. Duncan*, --- F.3d ----, No. 04-0604-PR, 2005 WL 1513160 at *3 (2d Cir. June 21, 2005); *Grey v. Hoke*, 933 F.2d 117 (2d Cir. 1991) ("We decline to presume that the New

---

[4] Respondent also argues that petitioner's claim regarding his application to submit a pro se brief is unexhausted. This issue is discussed *infra* at Section IV.

York Court of Appeals has 'a duty to look for a needle in a paper haystack.'") (quoting *Mele v. Fitchburg Dist. Ct.*, 850 F.2d 817, 822 (1st Cir.1988)). Here, the letter from petitioner's appellate counsel, after stating that the letter was submitted "as an application for permission to appeal to the Court of Appeals in the above titled action," briefly recounts the procedural history of the case and then states: "I am enclosing copies of all the briefs filed in the Appellate Division as well as the Appellate Division's Decision. If there is any additional information that I can provide, I would be happy to do so." This language is indistinguishable from the language cited in *Galdamez*, and the court therefore must conclude that petitioner has exhausted both his *Batson* and his excessive sentence claims.

## II.     *Batson* Claim

Petitioner claims that the prosecution's use of peremptory challenges of black jurors was discriminatory and violated the Equal Protection Clause of the Fourteenth Amendment. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), as embodied in 28 U.S.C. § 2254(d)(1), petitioner can prevail only if he demonstrates that the state court decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

A.     *Batson Standard*

Under *Batson*, 476 U.S. at 89, parties may not exercise peremptory challenges to exclude jurors "solely on account of their race." It is undisputed that *Batson* was clearly established federal law at the time that petitioner's conviction became final, in 2002. *Batson* sets forth a three-step inquiry for determining whether a party has exercised peremptory challenges in a discriminatory

manner. *See Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). First, the opponent of the challenge must make out a *prima facie* showing of racial discrimination; second, the proponent of the challenge must come forward with a race-neutral explanation for the challenge; and third, the trial court must decide whether the opponent of the challenge has proved purposeful discrimination by a preponderance of the evidence. *See id.*

With regard to the first step of the inquiry, in order to establish a *prima facie* showing, a defendant must show facts and circumstances that raise an inference that the prosecutor used the peremptory challenge to exclude potential jurors on account of their race. *Overton v. Newton*, 295 F.3d 270, 277 (2d Cir. 2002) (*citing Batson*, 476 U.S. at 96). Only if a *prima facia* case of discrimination is found does the burden shift to the prosecutor to articulate race-neutral reasons for the challenges. *Batson,* 476 U.S. at 97. This second step of the process "does not demand an explanation that is persuasive, or even plausible. At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett*, 514 U.S. at 768.

At the third step, "the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.* Thus, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir. 2003) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)); *see also Miller-El v. Dretke*, --- U.S. ----, 125 S.Ct. 2317, 2325 (2005) ("*Miller-El II*").

    B.    *Analysis*

Petitioner argues that the Appellate Division's decision that petitioner failed to establish a *prima facie* case of discrimination was an unreasonable application of federal law ,[5] and that the trial court's determination that the State's proffered reasons for peremptorily challenging black jurors were not pretexts for discrimination was in error.

    1.    *Prima Facie* Case (*Batson* Step One)

A state court decision is an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 344 (quoting *Williams*, 529 U.S. at 409). Here, the Appellate Division identified the correct governing principle in concluding that petitioner failed to establish a *prima facie* case under *Batson*. *See People v. Collins*, 290 A.D.2d at 514 (petitioner's "assertion that the prosecutor struck a disproportionate number of black venirepersons was insufficient to establish a pattern of purposeful exclusion sufficient to raise an inference of discrimination."). Thus, "the dispositive question under the 'unreasonable application' prong of § 2254(d)(1) is whether it was 'objectively unreasonable' for the Appellate Division to determine that [petitioner] failed to make a prima facie showing" of discrimination. *See Harris*, 346 F.3d at 344.

Petitioner argues, in support of his contention that it was objectively unreasonable for the

---

[5] Petitioner does not argue that the state court decision was "contrary to" Supreme Court precedent. Therefore, this court does not examine whether the "state court arrive[d] at a conclusion opposite to that reached by the [the Supreme] Court on a question of law or if the state court decide[d] a case differently than the [Supreme] Court has on a set of materially indistinguishable facts." *See Harris v. Kuhlmann*, 346 F.3d 330, 344 (2d Cir. 2003).

Appellate Division to determine that he failed to make a prima facie showing of discrimination, that the percentage of peremptory challenges made by the prosecutor against black persons sufficiently exceeded the percentage of black persons in the jury pool to raise a strong inference of discrimination. It is his contention that a *prima facie* case of discrimination was established by the fact that, at the time of the final *Batson* challenge*,* which was prior to the end of jury selection, 50 percent (4 of 8) of the prosecutor's peremptory challenges were against black persons. "[S]tatistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite *prima facie* showing under *Batson*." *Overton*, 295 F.3d at 278. Petitioner relies on *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir. 1990), where the Court states that "a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson*." In *Alvarado*, the Court held that, where the minority percentage of the venire could not be known, the minority percentage of the district from which the venire was drawn could serve as a "surrogate." *Id.* The district's minority percentage was 29, while the prosecutor's minority challenge rate was 50 percent in the jury of 12 and 57 percent in the jury of 12 plus alternates. *Id.*

In this case, it cannot be said, on the basis of the statistics alone, that it was objectively unreasonable for the Appellate Division to find that petitioner had failed to establish a *prima facie* case of discrimination. The percentage of the venire that was comprised of blacks, over the entire course of jury selection, is unknown. Petitioner relies on the fact that, at the time of the final *Batson* challenge, the prosecutor's challenge rate was 50 percent, which is more than "twice the likely minority percentage of the venire." *See Alvarado*, 923 F.3d at 256. According to petitioner, at that point in jury selection, in the sixth round, the percentage of peremptory challenges against blacks, at 50 percent, was 2.5 times higher than the percentage of black persons in the population of Queens

County, which was 20 percent. *See* Petitioner's Supplemental Brief at 11 (citing 2000 U.S. Census Bureau Statistics). Review of the record supports this statistical conclusion, and were these the relevant statistics, they might be determined sufficient to establish a *prima facie* case. *See Overton*, 295 F.3d at 278; *Cf. Miller-El v. Cockrel*, 537 U.S. 322, 342 (2003) (*"Miller-El I"*) (holding that Court of Appeals erred in denying a Certificate of Appealability to petitioner because "the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors" where prosecutors had used their peremptory challenges to strike 91 percent of the eligible black venire members and 70 percent of prosecutor's total peremptory strikes were against blacks).

However, the sixth round statistics that petitioner cites are not determinative with regard to whether the Appellate Division erred in concluding that petitioner failed to make out a *prima facie* case. In *Overton*, our Court of Appeals held that it could not conclude that the trial judge's actions constituted an unreasonable application of the *Batson* requirements because the *Batson* application was made in the second round, prior to the conclusion of jury selection, and thus the cited statistics did not reflect the prosecutorial challenge rate at the conclusion of jury selection. *See Overton*, 295 F.3d at 278. In *Overton*, by the end of the second round, the prosecutor had used 7 out of 10 of his peremptory challenges against blacks, and those seven black potential jurors constituted seventy percent of the "qualified blacks." *Id.* at 274. As in *Overton*, petitioner did not make a *Batson* application at the conclusion of jury selection, and thus "the trial judge never confronted, and the trial record does not reveal, what the statistics would have shown at the conclusion of jury selection." *See id.* at 279. Furthermore, petitioner's *Batson* applications at trial failed to cite the statistics that are now before this court – the precise prosecutorial challenge rate of blacks and the

percentage of Queens County that is comprised of blacks.[6]  The court cannot conclude that either

the Appellate Division or the trial judge made an objectively unreasonable finding where the *Batson*

applications did not include a complete picture of contrastable statistics and were made "midway

in the process."  *See id.* at 280; *see also Sorto v. Herbert*, 364 F.Supp.2d 240, 244 (E.D.N.Y. 2004).

Even were the court to consider the end of jury selection statistics, with which the trial judge

was never confronted, the final prosecutorial challenge rate of black persons (4 out of 13) was

approximately 30 percent,[7] and the Census data cited by petitioner indicates that 20 percent of the

residents of Queens County are black.  "Only a rate of minority challenges *significantly* higher than

the minority percentage of the venire would support a statistical inference of discrimination."

*Alvarado*, 923 F.2d at 255 (emphasis added).  Petitioner does not point to any authority supporting

the proposition that such a small disparity as occurred in this case is sufficient to establish a *prima*

*facie* case.  Even were the disparity sufficient to establish a *prima facie* case, this court would not

hold on collateral review that a decision of the state court to hold it insufficient was objectively

unreasonable.

Petitioner also argues that the Appellate Division's decision to address only whether

---

[6] Had a challenge been made at the conclusion of jury selection, the trial court could have been presented with a number more pertinent than the Census data for Queens – the total number of blacks who had been potential jurors.

[7] The prosecution actually exercised less than one third of its challenges against blacks.  It appears that the prosecution exercised thirteen total peremptory challenges, with four against blacks, but the record is not completely clear.  At the point Ms. Sabb was challenged, in the sixth round, the prosecutor had exercised eight peremptory challenges, four of which involved black potential jurors.  By the end of the sixth round, three more individuals had been challenged, potential jurors Wu (Tr. at 617), Parsley (Tr. at 618), and Epstein (Tr. at 619). The Clerk stated on the record that these challenges brought the number of prosecutorial peremptory challenges to eleven.  Tr. at 620.  In the seventh round, the prosecutor appears to have peremptorily challenged a 12th potential juror, Sarah Stockdale, which caused the defense attorney to state "How did I know that was gong [to] happen?"  Tr. at 705.  But immediately after that challenge an off the record discussion ensued, which somewhat obscures the record.  Because nothing in the record demonstrates otherwise, the court must assume that Stockdale was excused peremptorily and that she was not black. The thirteenth peremptory challenge by the prosecution was exercised against potential juror Gershman in the eighth and final round.  Tr. at 810.

petitioner established a *prima facie* case constitutes an unreasonable application of federal law, in light of *Hernandez v. New York*, 500 U.S. 352 (1991). The general rule discussed in *Hernandez* is that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot." *Hernandez*, 500 U.S. at 359. However, the *Hernandez* court was discussing the situation of an appellate court's review of a record where the trial court had failed to rule on the *prima facie* case issue. *See id*. at 356. *Hernandez* thus stands for the logical proposition that an appellate court need not concern itself with determining whether a *Batson* applicant established a *prima facie* case if the trial court skipped that step in the three-step process and ruled only on the ultimate question. *See id*. at 359 ("the trial court had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination. This departure from the normal course of proceeding need not concern us."). Nothing in *Hernandez* suggests that an appellate court, or a habeas court, reviewing a record where the trial court ruled on all three *Batson* questions, must rule on steps two and three of the *Batson* analysis if the court finds that the trial court correctly found no *prima facie* case. *See United States v. Diaz*, 176 F.3d 52, 76-78 (2d Cir. 1999) (holding, on direct review, that district court correctly decided that no *Batson prima facie* case had been established and affirming the conviction without examining if the district court's conclusion as to ultimate *Batson* question was correct); *Sorto*, 364 F.Supp.2d at 252 (holding that the "*Hernandez* holding simply reflects the common sense view that, after the trier of fact has resolved the ultimate issue. . . it makes little sense to review the question of whether the trial judge erroneously decided what in essence was the winning party's motion for summary judgment."); *see also People v. Redish*, 262 A.D.2d 664 (2d Dep't 1999) ("The fact that

the trial court permitted the People, upon the prosecutor's request, to offer facially-neutral reasons supporting the peremptory challenges does not render academic the issue of whether the defendant carried his initial burden to make a prima facie showing that the prosecutor's peremptory challenges were motivated by an intent to invidiously discriminate against black persons.").  The court thus rejects petitioner's argument that the Appellate Division's decision to rule only on whether he had established a *prima facie* case was an unreasonable application of federal law.

2.      Race-Neutral Justifications as Pretexts (*Batson* Steps Two and Three)

Even if petitioner could succeed on his claim that the trial court and the Appellate Division erred in ruling that he had failed to establish a *prima facie* case, petitioner fails to demonstrate that the trial court's conclusions that the undisputedly race-neutral justifications offered by the prosecutor were not mere pretexts for discrimination was objectively unreasonable.  The question of whether or not the prosecutor's justifications were pretextual is a factual question, and the court must therefore presume that the state court decision is correct, absent clear and convincing evidence to the contrary.  *See Miller-El I*, 537 U.S. at 340 (citing 28 U.S.C. § 2254(e)(1)).  In examining this question, this court first must assess whether the trial court did, in fact, rule on the validity of the prosecution's justifications and then whether petitioner has demonstrated by clear and convincing evidence that the state court's finding of the absence of purposeful discrimination was incorrect.

The record supports the conclusion that the trial court ruled on the ultimate issue of intentional discrimination, at least as far as two of petitioner's challenges prior to the conclusion of jury selection.  *See* Tr. at 322 (the Court: "I believe that's a reasonable response to the argument that you are challenging this person," after prosecutor offered an allegedly race-neutral justification for

15

challenging "Miss Brown"); Tr. at 323 (the Court: "the People have exercised a challenge, they didn't have to gave[sic] reason for it. Mr. Osnowitz did give a reason for it. The reason as far, as I am concerned, has merit, not withstanding your arguments to the contrary, and I will let that challenge stand."); Tr. at 412 (the Court stating, after the prosecutor offered a race-neutral justification for challenging a black juror, "Thought I already made [a determination], but there has been some further discussion on it, and I believe I adhered to my initial position and my ruling.").

Petitioner argues that the prosecutor's purportedly race-neutral justifications for peremptorily challenging a black potential juror were equally applicable to white potential jurors who were not challenged. Petitioner further argues that the prosecutor's justification for peremptorily challenging a second potential juror was illogical. Such evidence can support the conclusion that the prosecutor's justifications were pretexts for discrimination. *See*, *e.g.*, *Miller-El II*, 125 S.Ct. at 2325 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step."); *Miller-El I*, 537 U.S. at 343. However, the trial court's determinations that the justifications were not pretexts is not an "unreasonable application" of Federal law unless petitioner can demonstrate, by clear and convincing evidence, that the trial court erred. *See McKinney*, 326 F.3d at 101.

   a.   Carolyn Brown

Petitioner points to the prosecutor's justification for peremptorily challenging potential juror Carolyn Brown, a black woman. The prosecutor said she did not believe Ms. Brown could be impartial in a case involving a self-defense argument. The prosecutor stated:

> The reason is, Miss Brown stated on examination by Miss Byrne she
> works with the mentally ill and she is hit almost every day. She is in

> a position of – This is a self-defense case. I don't want a juror who is
> in this position every day at work. She has to do something. Because
> we only have a limited time to know her, we have ten minutest to talk
> to all of these people an I would feel uncomfortable. Her husband
> is unemployed. Doesn't work. Don't know much about her and
> about her job, and being that she brought out that she is hit every day
> I wouldn't want to have a juror on a self-defense case that is judging
> whether or not someone else was justified to retaliate.

Tr. at 321-322. Petitioner asserts that this justification was applicable to multiple white jurors who were not challenged and that this evidences the pretextual nature of the justification. Petitioner argues that jurors Mary Parrish, George Kurland, Ling Tom, and alternate Sam Gelb all asserted, in some form, that "they would not turn the other cheek or would hit back." Petitioner's Supplemental Brief at 16. Indeed, the record reflects that these jurors asserted their belief in retaliation. See Tr. at 396 (Parrish stating "I personally think if I was hit, I would hit back. I might not think about it first so I feel that I have that right."); Tr. at 459 (Kurland stating "Yeah. I think the key word is defend," in response to the question "[i]s there anybody here who believes that a person should not have the right to defend him or herself with physical force?"); Tr. at 609 (Tom stating "If I'm capable of hitting back, yes, I would," in response to the question "If anybody hits you, would you hit them back."); Tr. at 803 (Gelb stating "I feel they have the right to hit back. And you know, it all depends on the circumstance," in response to the question "[i]s there anybody here who feels that a person should not have the right to hit back if he or she is attacked.").

On the basis of this record, petitioner has failed to establish that the prosecutor's justification for challenging a black potential juror was applicable to non-black jurors who were seated. Though Brown, like other, non-black jurors, expressed her belief in the right to retaliate (Tr. 299), the rationale for excluding Brown was that, unlike the other jurors, she was forced by her occupation to deal with potential retaliatory situations on a regular, daily basis. This aspect of Brown's

testimony is not present in the testimony of any of the other potential jurors.  Without some basis

for concluding that this rationale was similarly applicable to Parrish, Gelb, Tom, or Kurland, the

court must conclude that petitioner has failed to meet his burden, under AEDPA, of demonstrating,

through clear and convincing evidence, that the trial court's decision involved an unreasonable

application of clearly established federal law.

       b.    Tony Barnes

Petitioner next points to the prosecutor's justification for peremptorily challenging potential

juror Tony Barnes, a black woman.  That justification was that the prosecutor believed that Barnes

would be overly sympathetic to an indigent senior.  The prosecutor stated:

> Just to preserve the record, this woman works for Covenant House,
> she is a residential advisor.  She deals in getting people on the right
> start in life. That's her job every day, she deals with people that are
> homeless or have problems trying to get them, so she in my view, in
> our view, she may be more of a sympathetic witness to a 72 year old
> man who is living in a senior house.  This isn't a senior quarters
> where they are paying $3500 a month.  This is a location for people
> who are veterans an don't have money, and that the reason we don't
> want here on the jury.

Tr. at 411-412.  Petitioner asserts only that this explanation is illogical, in that Barnes worked with

young persons, not seniors, and that Barnes expressed no special sympathy for seniors during voir

dire.  Though Barnes worked with young people, the idea that a person whose occupation entails

assisting indigent persons might be particularly sympathetic to an indigent defendant does not

inherently suggest pretext. Without some demonstration that the prosecutor's justification was

equally applicable to seated jurors, or other evidence pointing to discrimination, the court must

conclude that the plaintiff has failed to meet his burden, under AEDPA, of demonstrating, through

clear and convincing evidence, that the trial court's decision involved an unreasonable application

of clearly established federal law.

c.    Celeste Sabb

Petitioner argues that the question of whether or not the challenge against Celeste Sabb, a third black potential juror who was peremptorily challenged, was proper "cannot be determined," since "the trial court erroneously failed to elicit reasons from the prosecutor for the challenge against Mrs. Sabb." Petitioner's Supplemental Memorandum at 18. The trial court concluded that petitioner had failed to establish a *prima facie* case and the prosecutor did not offer a race-neutral justification. Tr. at 617. As discussed above, petitioner has failed to demonstrate that the state court's conclusion that he failed to establish a *prima facie* case was unreasonable.

On the basis of the totality of the evidence produced, it cannot be said that the petitioner has demonstrated, through clear and convincing evidence, that the trial court's decisions that no *prima facie* case had been made and, as to two of the three jurors, that the prosecution's challenges were not discriminatory, were unreasonable applications of federal law. The statistical evidence produced by petitioner, as discussed above, does not point to the likelihood of discrimination. Petitioner has failed to demonstrate inconsistent application of the justifications offered by the prosecution after *Batson* challenges. Finally, the race-neutral justifications offered do not suggest discriminatory intent by their nature. The facts in this case sharply contrast with those in *Miller-El II* and *Miller-El I* (together "*Miller-El*," as these cases are based on the same facts), the recent Supreme Court decisions involving *Batson* challenges. In *Miller-El*, the prosecutor used over 70 percent of his peremptory challenges to strike black jurors, as opposed to the approximately 30 percent prosecutorial challenge rate in the case at hand.[8]  *See Miller-El I*, 537 U.S. at 342. The Supreme

---

[8] The *Miller-El* decisions emphasize that 91% of the eligible black jurors were excluded. The percentage of eligible black jurors excluded in this case is not on the record and was never presented to the state courts.

Court also relied on numerous examples of justifications for excluding black potential jurors that were equally applicable to nonblacks who were not excluded. *See Miller-El II*, 125 S.Ct. at 2325-2333. The Court also relied on evidence of discriminatory questioning during *voir dire*, as well as evidence that the Dallas District Attorney's Office had a systematic policy of excluding black jurors. *See id*. at 2334-2339. As detailed above, no similar evidence is present in the instant case. Therefore, petitioner's *Batson* claim is rejected.

## III.    Fourth Amendment Claim

Petitioner's claim that the trial court improperly denied his suppression motion is barred under *Stone v. Powell*, 428 U.S. 465 (1976). Under *Stone*, "a Fourth Amendment claim may not be considered by a federal habeas corpus court if the state has provided an opportunity fully and fairly to litigate it." Accordingly, in order to receive habeas review of a Fourth Amendment claim, a petitioner must demonstrate either that the State failed to provide any "corrective procedures" by which the Fourth Amendment claims could be litigated or that the petitioner was unable to avail himself of those procedures "because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). The federal courts have repeatedly "approved New York's procedure for litigating Fourth Amendment claims," *Id*. at 70 n.1, and petitioner has not argued that there was a breakdown in the corrective procedures that prevented him from availing himself of them. The "corrective procedure" in this case was the hearing and decision that resulted from petitioner's suppression motion, under New York law. *See Gates v. Henderson*, 568 F.2d 830, 837, 842 n. 4 (2d Cir.1977) (question of whether New York State provides adequate procedures for litigating Fourth Amendment claims "cannot be open to serious challenge."), *cert. denied* 434 U.S.

1038 (1978). In order to demonstrate an "unconscionable breakdown" in the procedure, petitioner would have to demonstrate that the "state courts 'failed to conduct a reasoned method of inquiry into relevant questions of fact and law.'" *See Armstrong v. Duncan*, 03-CV-930, WL 22339490 (S.D.N.Y. Oct. 14, 2003) at *5 (quoting *Capellan*, 975 F.2d at 71). No such demonstration has been made. Thus, petitioner is barred from seeking habeas corpus review of this claim.

## IV.     Denial of Motion to file *Pro se* Brief

Petitioner's claim that the Appellate Division's denial of his motion to file a *pro-se* supplemental brief constitutes grounds for *habeas* relief is meritless. First, this claim appears to be unexhausted, which bars this court from reviewing it.[9] Second, it is well established that, under New York law, a defendant does not have a right to file a *pro se* supplemental brief. *People v. White*, 73 NY2d 468, 479, *cert. denied*, 493 U.S. 859 (1989). Most significantly, even if this right did exist under New York law, its denial would not mean that petitioner was being held in violation of federal law, as "there is no constitutional right to hybrid representation," where a defendant both represents himself and has assistance of counsel. *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir.), *cert. denied*, 522 U.S. 846 (1997). Though a defendant has a right to appear pro se as well as a right to appointed counsel, "those rights cannot be both exercised at the same time." *See Ennis v. Lefevre*, 560 F.2d 1072, 1075 (2d Cir. 1977) (holding that State was not required to consider petitioner's supplemental pro se brief where petitioner's counsel had submitted a brief), *cert. denied*, 435 U.S. 976 (1978). Accordingly, petitioner's claim, even if not defaulted, is without merit.

---

[9] The Appellate Division denied petitioner's motion to file a pro se brief, but petitioner did not submit this as an issue in his application for leave to appeal to the Court of Appeals. *See* Exhaustion discussion in Section I. However, petitioner may not go back to state court to exhaust this claims, as he has no right to another appeal. Thus, the claim is procedurally defaulted.

## V. Excessive Sentence Claim

When a state prisoner's sentence falls within the limits set by the legislature of the State where the prisoner was convicted, the sentence does not present a federal constitutional question and cannot provide the basis of habeas corpus relief. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). Here, petitioner was convicted of second and third degree criminal possession of a weapon, for which he could have been sentenced to from three and one-half to fifteen years. New York Penal Law § 70.20(2)(a) and (b). Therefore, petitioner's four year sentence was within the range provided by the New York State Legislature, and petitioner's challenge to the length of his sentence is not cognizable in this court.

## VI. Ineffective Assistance of Appellate Counsel

Petitioner's claim of ineffective assistance of appellate counsel for failure to raise the denial of petitioner's suppression motion is denied. Petitioner's underlying Fourth Amendment claim, in this context, appears to be that he has such a light complexion that the police, searching for a "black man," could not properly have stopped him, and that the search and seizure that resulted in the police obtaining petitioner's gun was illegal as petitioner had not been given *Miranda* warnings.

In order to prevail on an ineffective assistance of counsel claim, a petitioner must show both that his counsel's performance fell below the objective standard of reasonableness dictated by prevailing professional norms and that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 667-88, 694 (1984). Under the first prong, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. To establish the second, "prejudice" prong, a petitioner must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A "reasonable probability" in this context is one that undermines confidence in the outcome of the proceeding. *Id.* at 694.

Petitioner fails to demonstrate that his appellate counsel was constitutionally ineffective. The failure to raise the Fourth Amendment claim on appeal was not below the objective standard of reasonableness dictated by prevailing professional norms. Petitioner's appellate counsel had no reason to believe that the Fourth Amendment claim could succeed. First, the officers had probable cause to stop him based upon the detailed description of him given by the victim and his location. Second, as to petitioner's *Miranda* argument, under New York law "an officer may ask questions to clarify a potentially dangerous situation before giving *Miranda* warnings." *See People. v. Oguendo*, 685 N.Y.S.2d 437, 439 (1st Dep't 1999). As the police had evidence that a man had been shot, and petitioner matched the description and was in the approximate location of the alleged perpetrator, it was not unprofessional for appellate counsel to have concluded there was no basis in law or fact to argue that the trial court's decision was erroneous. Even if there were error on the part of appellate counsel, it cannot be said that there is a reasonable probability that, but for this omission, the outcome of petitioner's appeal would have been different. Therefore, the Appellate Division's decision was not objectively unreasonable. The court therefore denies petitioner's claim of ineffective assistance of counsel.

**CONCLUSION**

The petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing that he was denied a constitutional right, a certificate of appealability is denied.

**SO ORDERED.**

_____/s/_____
**NINA GERSHON**
**United States District Judge**

**Dated: Brooklyn, New York**
       **July 27, 2005**